## RE TAXES ONOMEA SUGAR COMPANY.

### No. 1942.

Submitted December 23, 1930.   Decided January 26, 1931.

Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.

The Onomea Sugar Company, Limited, returned its property for taxation as of January 1, 1927, at $3,540,000. The tax assessor assessed the property at $4,335,000. Upon appeal by the taxpayer the tax appeal court rendered a decision valuing the property at $3,815,396.10. Both parties appealed to this court from the decision of the tax appeal court. The property was returned and assessed at its aggregate value as an enterprise for profit. The evi-

dence of the taxpayer shows that the area of its cane lands, owned in fee simple, is 6298.9 acres, while it is claimed on behalf of the Territory that under the evidence adduced by it the aggregate total area of cane lands, held in fee, is 6346.05 acres. The difference is an immaterial one, in the view which we take of the case. In all other respects, as to the nature of its holdings, the tonnages of cane and of sugar produced, the cost of production, marketing and sale, the extent of its investments in the stocks of other corporations and the nature and the extent of its property not engaged in the production of sugar, the evidence is, in the main, undisputed. The controversy relates to the methods to be pursued and the principles to be followed in ascertaining the value of the taxable property of the corporation.

The trial in the tax appeal court began on March 22, 1928, and continued from day to day, with some longer intermissions, until September 27, 1928. Hearings were had on eighty-one separate days. The transcript of the testimony covers 4260 pages and the briefs over 600 pages. In addition, a large mass of exhibits was filed. The case, however, in its essentials is not any different from the ordinary case of the tax appeal of a corporation engaged in the cultivation of cane and the manufacture and sale of sugar. The principles involved have been repeatedly stated and restated by this court. There is no further occasion to discuss them elaborately. Brief references will suffice.

In the application of what has been called the "stock sale method" of computation of the value of an aggregate enterprise for profit, the facts are clear and undisputed. 125,000 shares of the capital stock are outstanding. On the day before the assessment date, to-wit, on December 31, 1926, the stock sold in small lots on the open market at $41 per share, or a total of $5,125,000 if all of the stock had been sold at the same rate. Following the well estab-

lished practice of this court, supported also by the testimony in the case at bar, a deduction of 10% is made upon the theory that large lots would sell necessarily at a lower price than small lots. Deducting, then, $512,500 from the gross sales first above ascertained leaves $4,612,500. The liabilities of the corporation on the assessment date were $317,502. Adding this amount, upon well settled principles, the value of all of the property, nontaxable as well as taxable, would be $4,930,002. The value of the nontaxable property of the corporation (further reference will be made to this subject hereinafter) was $1,760,663.29. Subtracting this from the last sum above named, the result reached is that the taxable property on the assessment date was of the value of $3,169,338.71.

Turning now to the method of capitalization of profits: the purpose of this method, as has been often said, is to ascertain what an intending purchaser, moved by a desire to make a permanent investment and not merely by a desire to gamble or speculate, would be willing to pay for the property involved. Such a prospective purchaser would seek to ascertain from the experience of the plantation company in the past as well as from any other available source, what profits his investment would yield in the future, the result, of course, even with the most careful purchaser, being at best an estimate only and not a mathematical certainty. In this connection the taxpayer contends for an estimated annual profit for the future of $367,372.78, basing this figure upon estimates testified to by its manager and other witnesses of acreages to be planted in the future and of crops to be harvested, of costs of production and of the probable price of sugar. On the other hand, the undisputed evidence shows that during the period of six years next preceding the assessment date the actual experience of the corporation was that its taxable property (excluding only the land leased to Shipman, but

including automobiles and trucks specifically and separately taxed under the law) produced net profits as follows: in 1921, $62,061.61; in 1922, $370,554.10; in 1923, $472,084.72; in 1924, $648,520.39; in 1925, $339,680.11; in 1926, $461,417.78;—or a total for the six years of $2,354,318.71, and an average per year of $392,386.45. Much of the calculating in the briefs is done upon the average of the profits for the four years 1923-1926, inclusive. In the absence of substantial reasons to the contrary, a somewhat longer period of years ought to furnish a more dependable average of profits than a somewhat shorter period of years. In this instance there can be no doubt that the excellent showing of profits for 1924 was extraordinarily high. Without discarding that figure and without substituting for it an assumed amount equal to that of the preceding or the succeeding year, the adoption of the longer period of six years for this method of calculation furnishes the counterbalancing influence of a year (1921) of extraordinarily low profits. An intending and thoughtful purchaser would seek to learn what the bad years produced as well as what the good years produced and would strike an average for all of them. As in other recent tax appeals, we feel more confidence in the actual experience of the past than we would in mere estimates for the future which may conceivably have been influenced to some degree, though slight and in good faith, by a feeling of undue pessimism. Upon the evidence adduced we find that the reasonable and proper rate of capitalization in this instance is 12½%. Two men long prominent in the financial affairs of this Territory, and one other with wide experience in financial and other branches of activity, and all three familiar with the history and developments of the sugar industry in Hawaii and the attitude of investors towards the same, have testified that in their opinion 12½% is the correct rate. It is true that it is the court that is

ultimately to decide upon the rate to be adopted in any particular tax case, but that of itself is not a sufficient reason for the exclusion of opinion evidence which in other respects would be admissible. We think that the expert opinions under consideration were correctly admitted by the tax court.

Capitalizing, then, the average annual profits for the six years, $392,386.45, at 12½%, the result is $3,139,091.60. Adding the value of the lands leased by the taxpayer to one Shipman, to-wit, $10,848, and subtracting $11,942.41, being the value of automobiles and trucks, the use of which contributed to the production of the profits which are being capitalized and which automobiles and trucks are taxed separately under the law, the net result is a valuation of $3,137,997.19,—a result unusually close to that reached by the stock sale method.

One rate of capitalization "may be used as to the less certain and less dependable income received directly from the production of sugar and another rate for the more certain and more dependable income received from the investments of the same corporation in the stocks and bonds of other corporations or from other non-taxables." *In re Taxes W. A. Co.*, 30 Haw. 755, 756, 763. In the case at bar, however, the rate of capitalization of the income derived from the nontaxables need not be considered because only the income from the taxables has been above capitalized, the result thus necessarily showing the value of the taxables. If (complying literally with the requirement of the statute) to that we add the value of the nontaxables, whatever the rate of capitalization for this latter purpose, we must again subtract the same value so found for the nontaxables and the value of the taxables remains unaffected.

Two witnesses (Williams and Burdick), called by the assessor, who had in preparation for the trial visited the

'plantation of the taxpayer and familiarized themselves with the mill, machinery, plows, tractors, flumes, roads and other personal property of the corporation, gave testimony in detail and at great length, which was intended to show the value of that property. A careful examination of the testimony given by each of these two witnesses shows that what they did was to ascertain, with the aid of catalogues and of persons who had had experience in the purchase and sale of similar articles, what it would have cost to reproduce, new, on the assessment date, the mill, machinery and other property, then to observe the effect of age and wear and tear on each article and to form an opinion as to the percentage which should be allowed for that "observed depreciation" and subtract the allowance from the cost of reproduction, calling the result the "present worth" or "appraised value." Repeatedly each of them stated that in his judgment the cost of reproduction, minus the allowance for depreciation, constituted the present worth or the appraised value. It is true that each also testified that in his opinion the "full cash value," using that expression, was the same in figures as the present worth or the appraised value reached in his observations and calculations. It is obvious, however, that neither of them gave any study to or had any knowledge of what the various items of property under consideration would have brought, at auction or at private sale (whichever would bring the best results) for cash, on the assessment date, after fair and full advertising. This latter is the correct test of full cash value in this Territory for taxation purposes, as this court has heretofore held. See for example *In re Taxes James B. Castle,* 15 Haw. 1, and *In re Taxes W. A. Co., supra.* It is true that, as held in the case last cited, at page 765, "in the absence of other evidence, the original cost, minus depreciation, may indicate the salable value,—particularly in cases in which the property

has been recently acquired." It is conceivable, also, that in the absence of other evidence the cost of reproduction at the assessment date, minus depreciation, may furnish some guide as to the full cash value, as for example again, in cases in which the property has been recently acquired and there has been no opportunity to demonstrate what its profit-producing capacity is or what investors in the open market think of it as a subject of investment, or in which there has been manipulation or other fraud relating to the market price of the stock at or near the assessment date or to the amounts of the profits. Ordinarily, however, as also was said in the same *Waialua* case, more direct and clearer evidence of the full cash value is obtainable. The Onomea plantation is an old and well established one and has amply demonstrated its profit-producing capacity and the evidence abundantly shows what that capacity is.

For another reason the evidence of the witnesses Williams and Burdick is not helpful. What each testified to was the so-called present worth or value of each item of property, not if it was sold separately on the assessment date, but if it was sold in conjunction with all of the other personal and real property of the corporation to a purchaser desirous of continuing its joint maintenance and operation as a sugar-producing concern. To our minds it is not practicable to find the so-called "separate" value of an article when used and sold in conjunction with all the other property of a corporation as an enterprise for profit. Either the value is to be sought as of all the property used and sold, in combination, or the various parts are to be valued as if sold separately on the market on the assessment date. In its essence the effort of each of these two witnesses was not to find the separate value of each part of the property, but to find the aggregate value of all the parts, attributing to each what seemed to him a fair por-

tion thereof. Neither of them had had any experience such as would qualify him as an expert in arriving at the views which he testified to. We find no assistance in the testimony which they gave. A third witness for the Territory, Sullivan, gave no evidence of cash values. His testimony consisted simply in computations and "allocations" which have not been helpful in indicating the value of the aggregate enterprise for profit.

With much detail counsel for the Territory have contended for separate valuations for the lands (in various classes) of the taxpayer, for the cane stools which find their nourishment and growth in those lands, for the water which is essential for the transportation of the cane in flumes to the mill, for the flumes themselves, for the roads (considered apart from the lands upon which they stand) which the corporation has built over its property, and for houses, machinery, bridges, culverts and other separate items of property. We find it much more satisfactory, however, to ascertain what all of that property, when used in combination, has been able to produce and at what cost and with what profits, and then to apply the two methods above applied for ascertaining the aggregate value of all of the property so used in combination.

One of the contentions on behalf of the assessor is that in the use of the stock sale method the amount to be deducted as the value of the nontaxables is to be ascertained upon the principle that "the portion of the purchase price that" the purchaser of stock "pays for the interest that he acquires in the taxables and the portion of the purchase price that he pays for the interest that he acquires in the nontaxables are respectively such proportion of the entire purchase price as the income from taxables and the income from nontaxables bears to the entire income accrued from both taxables and nontaxables." To so hold would be to say in effect that every purchaser of all of the stock of a

plantation company must necessarily in his calculations have capitalized the income from the nontaxables at the same rate as the income from the taxables. Usually in sugar plantation cases, and clearly in this case, the investment in the taxables (not because they are taxables, but because they are the property used in the cultivation of cane and in the manufacture and sale of sugar, with all of the uncertainties and vicissitudes attending such cultivation, manufacture and sale) is a much more hazardous one than the investment in the nontaxables (not because they are nontaxables, but because they are usually purchased and held as provision against taxes and against unforeseen demands generally and because usually they are a safer class of securities yielding more certain and more nearly continuous returns). A purchaser with knowledge of the facts would not capitalize the more hazardous part of the business at the same rate that he would capitalize the less hazardous one. Assuming for example that a sugar corporation receives from its sugar-producing, taxable property 50% of its total net income and receives from its much safer nontaxables the other 50% of its net income, could it for a moment be thought that a purchaser would pay the same sum of money for the taxables that he would pay for the nontaxables? Certainly not. The principle invoked by the assessor cannot be adopted.

In another way this contention of the assessor can be readily shown to be ill-founded. Applying the principle thus contended for, counsel for the assessor reached the result that the total value of the nontaxables in this case is $467,720, as against the sum of $1,760,663.29 contended for by the taxpayer. The nontaxables listed in taxpayer's exhibit "CC" are as follows:

|  | Book Value | Adjustment to Book Values | Cash Value |
|---|---|---|---|
| Advances to planters | $219,831.90 | | $219,831.90 |
| Accrued interest | 4,186.32 | | 4,186.32 |
| Personal and trade accts. | 3,479.18 | 10% deducted | 3,131.26 |
| Bills receivable | 1,450.00 | 10% deducted | 1,305.00 |
| Notes receivable | 49,450.55 | | 49,450.55 |
| Credit balance with agents | 777,109.62 | | 777,109.62 |
| Bank of Hawaii, Honolulu | 175,000.00 | | 175,000.00 |
| Bank of Hawaii, Hilo | 39,092.23 | | 39,092.23 |
| 3791 shares C. & H. S. R. Corp. | 379,100.00 | | 379,100.00 |
| 5970 shares Haw'n Phil. Co. | 59,700.00 | 50% added | 89,550.00 |
| 58 shares Hilo Tribune-Herald | 1,160.00 | 90% deducted | 116.00 |
| Auto Trucks | 11,920.00 | 25% deducted | 8,940.00 |
| Automobiles | 4,003.22 | 25% deducted | 3,002.41 |
| Total cash value nontaxables, | | | $1,749,815.29 |
| Lands leased to W. H. Shipman, Ltd., assessed separately, annual rental $1,084.80, capitalized at 10% | | | 10,848.00 |
| Total cash value deductible assets, | | | $1,760,663.29 |

This schedule, including the cash values stated, has been sworn to by reputable witnesses as being true and correct. Not a word has been said in evidence on behalf of the assessor against the soundness of these investments or against the values attributed to them severally in the last column. There is no reason for believing that they are not all collectible at those values. The "credit balance with agents," $777,109.62, is shown by the testimony to be moneys on deposit with C. Brewer & Company, the agents, an eight million dollar corporation, and the two deposits of $175,000 and $39,092.23, respectively, are in the savings department of the Bank of Hawaii, an Hawaiian corporation engaged for many years past in the banking business. No reason whatever appears upon the evidence for doubting the solvency of these two institutions or their ability to pay upon demand the total of these three items, to-wit, $991,201.85. The process of reasoning by which these cash deposits, aggregating over $991,000, are found to be of a cash value of less than $468,000 must be an erroneous one.

Another contention of the assessor is that in the use of the stock sale method the deduction should not be of the

full cash value of the nontaxables but of the full cash value, less 10% thereof, the reason urged being that since 10% was deducted from the market price of December 31 of small lots of the stock, it should also be subtracted from the cash value of the nontaxables before deducting the result. This contention likewise cannot be sustained. The sole reason for the deduction of 10% above made is that a purchaser of large blocks of stock or of all of the stock of a plantation would ordinarily pay less per share than the purchaser of small lots only. It is as though the 10% were deducted from the market price of $41 found in this case for December 31, 1926, reaching the corrected market price of $36.90 for a purchaser of the whole. But the purchaser, while concluding to pay only $36.90 per share for all of the stock, counted on obtaining all of the nontaxables with all of their attendant value and not merely 90% of their value. The direction of the statute (R. L. 1925, § 1320) is to deduct "the value" of all nontaxable property and this means all the value and not merely a part of it.

Rulings of the tax court concerning the admission and the rejection of evidence are complained of. Assuming, as is probably the fact, that the tax court admitted a great deal of evidence offered by the assessor which should not have been admitted, we do not find that it excluded any which was offered by the assessor and which was material. The Territory certainly cannot successfully complain that it was not given a complete and ample opportunity to be heard. On the other hand, while it may have erroneously admitted some evidence offered by the taxpayer, as, for example, evidence relating to events subsequent to the assessment date, we have placed no reliance upon that evidence, but have based our conclusions on evidence which was unobjectionable.

Other contentions of the assessor need not be referred

to specifically. It would lengthen this opinion unnecessarily to do so. They are overruled.

The return of the taxpayer at \$3,540,000 is sustained and the valuation of its property as of January 1, 1927, is fixed at that amount.

*H. R. Hewitt,* Attorney General, *H. T. Kay,* First Deputy Attorney General, and *E. C. Peters* for the assessor.

*Smith, Warren, Stanley & Vitousek* for the taxpayer.