# IN RE TAXES MAUI AGRICULTURAL COMPANY, LIMITED.

## No. 2238.

Argued May 31, June 1 and 3, 1938.  Decided June 13, 1938.

Banks and Peters, JJ., and Circuit Judge Metzger
in Place of Coke, C. J., Disqualified.

OPINION OF THE COURT BY PETERS, J.

This is the same case reported at page 515, *ante*. The merits of the taxpayer's objections to the assessment made of its personal property as of January 1, 1934, will now be considered within the limitations therein expressed except as modified by the occurrence to which we are about to refer.

After our earlier opinion was filed the taxpayer challenged the construction placed by us upon the admissions made by one of its attorneys and moved to strike our statement that "one of the attorneys for the taxpayer conceded, as we understand his admissions, that costs of 'growing crops' were used by the taxpayer in determining income tax liability under the territorial Income Tax Law." *Ante,* p. 556. The court refreshed its memory of the proceedings had upon the occasion of the admissions referred to and concluded that ample justification existed for its statement. But although the motion to strike was denied,

the court announced that it would consider the case as though the admissions of counsel had been withdrawn.

Had the concession not been made, we would not have confined the consideration of the general objections of the taxpayer as announced in paragraph 5 of our conclusions to the assessment of "machinery and equipment" as a whole, but would have included as subject to the same general objections the assessment of "growing crops" as a whole, and would have indicated by appropriate language the extent of review in the event that the general objections to the assessment of "growing crops" were or were not well-taken.

Hence it has become necessary to announce preliminarily as an additional conclusion resulting from the concrete application of the principles announced in our former opinion that we will also consider the general objections of the taxpayer "that, with the exception of annually inventoried merchandise and supplies, no valuation of personal property was made by it to determine income tax liability and that the provisions of the second sentence of section 9 of the Personal Property Tax Act did not apply," as applicable to the assessment of "growing crops" as a whole. Further, if these general objections are not well-taken, we will consider the four deductions claimed against the costs of "growing crops," numbered 1, 3, 6 and 7 respectively, but if deductible, only to the extent that said objections, or any of them, affect the assessment of "growing crops" as a whole. If the general objections, or either of them, are however well-taken, we will not consider the objection of overvaluation of "growing crops," the "growing crops" of the taxpayer not having been assessed separately for each item thereof according to law.

The assessment of "growing crops" was an *en masse* assessment. According to the return of the taxpayer (see *ante,* p. 522, note 1, item 18) "growing crops" were returned in a lump sum amount. This amount was described as the

"total costs allocated * * * to future crops including all costs of 1934 crop (both harvested and unharvested)." The lump sum of $2,157,009.34 is the summation of all the operating expenses of the taxpayer of the 1934, 1935 and 1936 crops to and including December 31, 1933 (exhibit "C" of report of treasurer of Maui Agricultural Company, Limited, tax assessor's exhibit "A"), set forth in the property accounts of the taxpayer as of December 31, 1933 (exhibit "A" report of treasurer of Maui Agricultural Company, Limited, tax assessor's exhibit "A"), and carried forward in the balance sheet of the taxpayer as of December 31, 1933, in the total sum entered to the credit of "property accounts." (Exhibit "H" report of treasurer of Maui Agricultural Company, Limited, tax assessor's exhibit "A.")

The acreage originally carried for the 1934 crop comprised 1001 acres plant and 3842 acres ratoons or 4843 acres total. (Report of manager of Maui Agricultural Company, Limited, under date of February 5, 1934, exhibit "A.") The details of the 1934 crop fields are quoted in the margin.[1] (See taxpayer's exhibit "2.") On October 16, 1933, an estimate was made of the 1934 crop, the details of which are quoted in the margin.[2] The area first carried for the 1935 crop comprised 1014 acres plant and 3580 acres ratoons or a total of 4594 acres. (See manager's report, tax assessor's exhibit "A.") The details of the 1935 crop fields of the taxpayer are quoted in the margin.[3] (See taxpayer's exhibit "4.") It was expected that about 825 acres would be planted for the 1936 crop and there would be about 3875 acres ratooned making a total of approximately 4700 acres. (Report of manager of Maui Agricultural Company, Limited, tax assessor's exhibit "A.") The details of the 1935 crop as of the taxation date are quoted in the margin.[4]

An analysis of the evidence discloses that each of the 1934 and 1935 crops consisted of plant cane and ratoons, the rotations of the latter of which varied. Each crop cycle

represents a growth from eighteen months to two years, except where short ratoons occur, consideration of which we deem immaterial for the purposes hereof. It also appears that the tonnage of cane per acre and the sugar-producing content of ratoons diminish proportionately as the rotation is prolonged. The plant cane respectively included in the 1934 and 1935 crops had been planted at least eighteen months prior to their respective maturity dates. Their growth was separated by at least eighteen months. Each successive ratoon represented a corresponding difference in growth. In respect to the 1936 crop, certain fields of the 1934 crop had been or were ratooned. The fields of the 1934 crop harvested in 1933 were ratoon fields of the 1936 crop. The ratoon fields of the 1934 crop harvested at the end of August or in September, 1933, were sprouted and above the ground on January 1, 1934, to a height of from twelve to eighteen inches. Fields for the plant cane of the 1936 crop had been plowed but not planted. The quality ratio, that is the number of tons of cane required to produce a ton of

| Field | Plant | 1st Rat | 2nd Rat | 3rd Rat | 4th Rat | 5th Rat | 6th Rat | 7th Rat |
|---|---|---|---|---|---|---|---|---|
| Hamakuapoko Division | | | | | | | | |
| 4 | | | | 10.20 | 227.38 | | | |
| 5 | | 326.84 | | | | | | 3.24 |
| 6 | 179.03 | | | | | | | |
| 7 | 180.57 | | | | | | | |
| Total | 359.60 | 326.84 | | 10.20 | 227.38 | | | 3.24 |

Total Hamakuapoko Division 927.26 Acres

Paia Division

| Field | Plant | 1st Rat | 2nd Rat | 3rd Rat | 4th Rat | 5th Rat | 6th Rat | 7th Rat |
|---|---|---|---|---|---|---|---|---|
| 41 | | | 188.06 | | | | | |
| 51 | | 196.26 | | | | 13.14 | | |
| 52 | | 68.09 | | | | | | |
| 53 | | | 218.47 | | | | | |
| 55 | | | 188.22 | | | | | |
| 60 | 193.23 | | 6.48 | | | | | |
| 62 | 7.07 | 149.78 | | | | | | |
| 64 | 1.50 | | | | | | 81.35 | |
| Total | 201.80 | 414.13 | 601.23 | | | 13.14 | 81.35 | |

sugar, varied greatly with different fields. This might result from the varying qualities of soil or varying quality ratios of the cane. A study of the tons of sugar per acre produced by 1934 crop fields from the 1925 crop to the 1934 crop, both inclusive, shows a rapid decline in crop tons per acre through the progressive rotations of ratoons. No doubt yields from ratoons of the 1935 crop, if compared with the earlier history of the same fields, would develop the same result. Obviously at the taxation date the physical conditions of each of the three crops differed widely from the others. Neither singly nor in combination did they admit of a common unit of measure. Assuming that the growth of every kind of cane included in each of the three crops

| Field | Plant | 1st Rat | 2nd Rat | 3rd Rat | 4th Rat | 5th Rat | 6th Rat | 7th Rat |
|---|---|---|---|---|---|---|---|---|
| Total Paia Division 1,318.13 Acres | | | | | | | | |
| Keahua Division | | | | | | | | |
| 21 | 107.43 | | | | | | | |
| 77 | | | | 352.71 | | | | |
| 78 | | | | 352.67 | 3.97 | | | |
| 79 | | 158.44 | | | | | | |
| 80 | | | | 61.61 | | | | |
| 82 | | | 255.39 | | | | | |
| 93 | | | | | 28.93 | | | |
| Total | | 265.87 | 255.39 | 766.99 | 32.90 | | | |
| Total Keahua Division 1321.15 Acres | | | | | | | | |
| Pulehu Division | | | | | | | | |
| 28 | 181.76 | | | | | | | |
| 84 | 236.53 | | | | | | | |
| 85 | | 134.65 | | | | | | |
| 86 | 23.50 | | | | | | | |
| 89 | | 273.44 | 85.62 | | | | | |
| 97 | | | | 352.38 | | | | |
| Total | 441.79 | 408.09 | 85.62 | 352.38 | | | | |
| Total Pulehu Division 1,287.88 Acres | | | | | | | | |
| Grand Total | | | | | | | | |
| | 1,003.19 | 1,414.93 | 942.24 | 1129.57 | 260.28 | 13.14 | 81.35 | 3.24 |

Total Net Areas 4,847.94 Acres
Surveyed and Mapped by K. Tanimoto
Approved by J. H. Foss

was respectively the same in growth and sugar-producing content, there were at least three separate items included in "growing crops" as the words "separate" and "item" are used in section 3 of the Personal Property Tax Act. To what extent each crop by reason of growth and sugar-producing content admitted of further classification, we do not pretend to say. Obviously neither plant nor first ratoon of the 1934 crop was of similar growth as the last ratoons of the same crop. The same observation might be made of the 1935 crop. There were as many separate items of cane

### MAUI AGRICULTURAL COMPANY, LIMITED.

#### ESTIMATE OF CROP 1934—MADE OCTOBER 16, 1933

| Field | Net Acreage | Tons Cane Per Acre | Tons Cane | Tons Sugar |
|---|---|---|---|---|
| Fields finished prior to October 16th. | | | | |
| 4 | 237.58 | 34.63 | 8,226. | 1,123. |
| 41 | 188.06 | 37.06 | 6,970. | 981. |
| 53 | 213.50 | 29.69 | 6,338. | 849. |
| 55 | 188.22 | 42.20 | 7,944. | 1,158. |
| | 827.36 | | 29,478 | 4,111 |
| ESTIMATED—(Ratio 7.25 to 1) | | | | |
| 5 | 330.08 | 57 | 18,814.56 | 2,595.11 |
| 6 | 179.03 | 95 | 17,007.85 | 2,345.91 |
| 7 | 180.57 | 65 | 11,737.05 | 1,618.90 |
| 21 | 107.43 | 43 | 4,619.49 | 637.17 |
| 28 | 181.76 | 80 | 14,540.80 | 2,005.63 |
| 51 | 209.40 | 46 | 9,632.40 | 1,328.61 |
| 52 | 68.09 | 52 | 3,540.68 | 488.37 |
| 60 | 199.71 | 68 | 13,580.28 | 1,873.14 |
| 62 | 156.85 | 68 | 10,665.80 | 1,471.14 |
| 64 | 82.85 | 80 | 6,628. | 914.21 |
| 77 | 352.71 | 38 | 13,402.96 | 1,848.68 |
| 78 | 356.64 | 41 | 14,622.24 | 2,016.86 |
| 79 | 158.44 | 40 | 6,337.60 | 874.15 |
| 80 | 61.61 | 50 | 3,080.50 | 424.90 |
| 82 | 255.39 | 52 | 13,280.28 | 1,831.76 |
| 84 | 236.53 | 72 | 17,030.16 | 2,348.99 |
| 85 | 134.65 | 25 | 3,366.25 | 464.31 |
| 86 | 23.50 | 66 | 1,551. | 213.93 |
| 89 | 359.06 | 55 | 19,748.30 | 2,723.90 |
| 93 | 28.93 | 25 | 723.25 | 99.76 |
| 97 | 352.38 | 55 | 19,380.90 | 2,673.23 |
| | 4015.61 | | 223,290.35 | 30,798.66 |
| Total | 4842.97 | | 252,768.35 | 34,910. |
| Average per acre | | | 52.19 | 7.21 |

in each crop as there were different classes of cane classi-
fied by growth and quality. The only cane of the 1936 crop
admitting of classification was the ratoons. Were this a
case of "growing crops" standing at the taxation period of
the same general kind, age and quality such as clover crops
or wheat crops, an assessment of "growing crops" as a
whole described by an appropriate unit of measure and
computed upon a common unit of value would constitute
an assessment of "growing crops separate for each item

MAUI AGRICULTURAL CO
CANE CROP 1935

| Field # | Plant | 1st Rat | 2nd Rat | 3rd Rat | 4th Rat | 8th Rat |
|---------|-------|---------|---------|---------|---------|---------|
| 8 | | | | 75.42 | | |
| 2 0 | | 60.92 | | | | |
| 2 2 | | | 267.15 | | | |
| 2 3 | 124.22 | | | | | |
| 2 4 | | 202.25 | | | | |
| 2 5 | | | 171.67 | | | |
| 2 6 | 194.92 | | | | | |
| 4 0 | | | 163.55 | | | |
| 5 6 | | | | | 217.12 | |
| 5 7 | | 164.71 | | | | |
| 5 8 | | | | | 139.34 | |
| 6 1 | 227.07 | | | | | |
| 6 3 | | 95.45 | 69.35 | | | |
| 6 6 | | | | | | 134.13 |
| 6 7 | 19.47 | | | 207.20 | | |
| 7 6 | | | 119.34 | | | |
| 8 1 | | 232.12 | | | | |
| 8 6 | 147.61 | 23.50 | | | | |
| 8 8 | | | | 243.44 | | |
| 9 0 | | | 300.87 | | | |
| 9 4 | | | | 192.23 | | |
| 9 5 | | | | 151.80 | | |
| 9 6 | | | | | 348.23 | |
| 9 8 | 300.80 | | | | | |
| Total | 1,014.09 | 778.95 | 1,091.93 | 870.09 | 704.69 | 134.13 |

TOTAL AREA 4,593.88 ACRES
Surveyed. &. Mapped. by. K. Tanimoto.
Approved. by J. H. Foss

thereof." But, where, as here, the growing crops of cane of the taxpayer included several different classes of cane, each substantially different in growth and quality, the assessment of "growing crops" as a whole constitutes an *en masse* assessment contrary to the express provisions of section 3 of the Personal Property Tax Act.

The question upon the determination of which the issues depend is: Do the provisions of section 9 of the Personal Property Tax Act apply in the instant case and if so to what extent? The section referred to is quoted in the margin.[5] No difficulty is encountered in arriving at the intention of the legislature by the language used in section 9 of the Personal Property Tax Act and especially in the second sentence of that section. No rules or maxims of construction or interpretation of statutes are necessary to discover that intention. It is perfectly plain. There is no room for doubt as to the meaning of the language employed. It is clear and unambiguous in its terms, unequivocal in its import, definite in its mandate. All statutes are presumed to be enacted by the legislative department of the government with full knowledge of the existing condition of the

[4]

## MAUI AGRICULTURAL COMPANY, LTD.

### 1935 Crop Fields
### Jan 1 1934

| Field No. | Acreage. | Plant Date Planted. | Rota- tion. | Ratoons Date last Harvested | |
|---|---|---|---|---|---|
| 8 | 74.72 (A) | | 3rd | November | 1932 |
| 20 | 60.92 | | 1st | April | 1933 |
| 22 | 267.15 | | 2nd | December 1932 Jan. | 1933 |
| 23 | 124.22 | April, May, 1933 | | | |
| 24 | 202.25 | | 1st | Jan., Feb., March | 1933 |
| 25 | 166.72 (B) | | 2nd | November | 1932 |
| 26 | 194.92 | May, June, July, 1933 | | | |
| 40 | 163.55 | | 2nd | November | 1932 |
| 56 | 217.12 | | 4th | Dec., 1932 Jan., Feb., Mar. | 1933 |
| 57 | 164.71 | | 1st | April, May | 1933 |
| 58 | 139.34 | | 4th | Feb., March | 1933 |
| 61 | 227.07 | July, Aug., Nov. Dec. 1933 | | | |
| 63 | 102.52 (C) | | 1st | March, April | 1933 |
| 63 | 69.35 | | 2nd | April, May | 1933 |

law with reference to it. (59 C. J., T. Statutes, § 616; *Halstead* v. *Pratt,* 14 Haw. 38, 39; *Tax Assessor* v. *Wood,* 18 Haw. 485, 486.) This presumption applies to the existing federal and territorial income tax Acts in existence in 1933 when the legislature passed the Personal Property Tax Act.

The taxpayer insists that under sections 1 and 3 of the Personal Property Tax Act upon the taxation date, personal property could be legally assessed only for its fair and reasonable value, and that the meaning attributable to the word "valuation" as used in section 9 of the Act

| Field No. | Acreage. | Plant Date Planted. | Rota-tion. | Ratoons Date last Harvested | |
|---|---|---|---|---|---|
| 66 | 134.14 (D) | | 8th½ | December | 1932 |
| 67 | 19.47 | June, 1933 | | | |
| 67 | 207.20 | | 3rd | March, May | 1933 |
| 76 | 119.34 | | 2nd | May, June | 1933 |
| 81 | 232.12 | | 1st | March, April | 1933 |
| 86 | 147.61 | March, Apr., May, June 1933 | | | |
| 86 | 23.50 | | 1st | December | 1933 |
| 88 | 243.44 | | 3rd | November, December | 1932 |
| 93 | 28.93 (E) | | 5th | January | 1934 |
| 90 | 300.87 | | 2nd | January, February | 1933 |
| 94 | 192.23 | | 3rd | June | 1933 |
| 95 | 151.80 | | 3rd | May, June | 1933 |
| 96 | 348.23 | | 4th | January | 1933 |
| 98 | 300.80 | Feb., March, April, 1933 | | | |

Total 4,624.24 Acres

Notes: A—Field 8—Crop Survey Acreage 75.42: reduced to 74.72 account Pump Ditch Installation after survey was made.
B—Field 25—Original Survey 171.67: corrected Survey 166.72 difference deduction of 4.95 acres.
C—Field 63—7.07 Acres added to field after original survey was made.
D—Field 66—Correction of .01 Acres.
E—Field 93—taken into 1935 Crop after Survey Book was made up.

Reconciliation with Crop Survey Book

| | | | | |
|---|---|---|---|---|
| Acreage as per Survey Book | | | | 4,593.88 |
| Addition: | Field 63 | 7.07 Acres | | |
| | " 66 | .01 " | | |
| | " 93 | 28.93 " | | 36.01 |
| | | | | 4,629.89 |
| Reduction: | Field 8 | .70 | | |
| | " 25 | 4.95 | | 5.65 |
| | | | Total | 4,624.24 Acres |

must be limited to and consistent with the provisions of sections 1 and 3 of the Act. That it might develop that a valuation used by the taxpayer for the determination of its liability under another taxing statute, federal or territorial, was not its fair and reasonable value on January 1, 1934, is immaterial to the issues in this proceeding. The provisions of the second sentence of the section are mandatory. In the absence of ambiguity its language will be construed according to its plain meaning and intent without regard to the invalidity, if any, inherent in its terms or resulting from its enforcement. If, as the government contends, the taxpayer on January 1, 1934, used valuations of personal property subject to taxation under the Personal Property Tax Act for the determination of its tax liability under the federal or territorial income tax laws, then the provisions of the second sentence of the Personal Property Tax Act in respect to the personal property, the valuation of which was so used, applies.

The first territorial income tax law was passed in 1896 (L. 1896, Act 65). This law was declared unconstitutional in 1897. (See *Campbell* v. *Shaw,* 11 Haw. 112.) The same law in modified form was passed in 1901 (L. 1901, Act 20). Territorial taxes upon net income in substantially the same form have prevailed ever since. The local law in effect on January 1, 1934, was Act 44 of the second special session of 1932. As amended it is included in the 1935 compilation as chapter 65.

---

[5]
"Section 9. Assessments, considerations in fixing valuations. It shall be the duty of the commissioner to cause to be determined and assessed the fair and reasonable value of all taxable personal property in the Territory. In all cases where, due to the provisions of any other taxing statute, federal or territorial, a valuation of personal property taxable under the provisions of this Act is used in the determination of tax liability under such other statute such valuation shall be used by the tax commissioner as the fair and reasonable value of such property within the meaning of this Act; provided, that when such valuation of personal property is made under both a federal and a territorial statute, and a different valuation is made under each, the higher of such valuations shall be used to determine such fair and reasonable value for the purposes of this Act."

A general income tax, as now understood, was not imposed by the federal government until after the adoption of the sixteenth amendment. The first federal income tax law, in the sense here employed, was the Act of October 3, 1913 (38 U. S. Stat. L., pt. 1, ch. 16, p. 114). A federal income tax has been continuously in effect ever since. The federal law in effect on January 1, 1933, was the Act of Congress of June 6, 1932 (47 U. S. Stat. L., pt. 1, ch. 209, p. 169). It will be hereinafter referred to as the "Revenue Act of 1932."

That the taxpayer valued its merchandise, supplies and machinery and equipment as of December 31, 1933, for the determination of its net income for the year 1933 is not open to serious dispute. The commonly accepted meaning of the word "valuation" is: The act of valuing; the act of estimating or appraising the value of a thing; estimated worth or value; appraisement. As employed in section 9 of the Personal Property Tax Act the signification of the term "valuation" is as broad or as narrow as the meaning or meanings respectively attributable to the valuations that might be legally used for the determination of tax liability under any other taxing statute, federal or territorial. The inventories of merchandise and supplies of the taxpayer were valued by the taxpayer at the close of the year 1933 at cost. In its balance sheet for the year ending December 31, 1933, it included as assets, machinery and equipment at cost less depreciation. A balance sheet is a statement of the financial condition of the enterprise to which it relates including the valuation of its respective assets. (Saliers, *Accountants' Handbook* [20th ed.], p. 320.) Its purpose is to show the financial position of a business at a given time. (Saliers, *supra*, p. 1426; Canning, *The Economics of Accountancy*, pp. 179-194.) Its chief use is to show solvency and the profits, if any, subject to distribution. (Canning, *supra*, p. 181.) Hence it is that a balance sheet should include all the assets and liabilities of the business at their

correct valuation. (Saliers, *supra*, p. 1427.) In the case of merchandise the cost thereof is evidence of value. (*Kash Co.* v. *Assessor*, 15 Haw. 476; *Re Taxes H. F. Wichman & Co.*, 16 Haw. 793, 795; *Lucas* v. *Structural Steel Co.*, 281 U. S. 268; *Kemp* v. *United States*, 25 F. [2d] 721.) In the case of machinery and equipment cost less depreciation is evidence of value. (*Re Taxes Onomea Sugar Co.*, 25 Haw. 278, 296; *Assessor* v. *Com. Cable Co.*, 16 Haw. 396, 404; *Re Taxes Waialua Agr. Co.*, 30 Haw. 755, 764, 765; *In Re Onomea Sugar Co.*, 31 Haw. 769, 775.)

Nor can it be seriously disputed that the taxpayer "used" the valuations of merchandise and of machinery and equipment respectively placed thereon by it as of December 31, 1933, for the determination of its tax liability under the federal and territorial income tax laws. The ordinarily accepted meaning of the verb "use" is: to employ for the attainment of some purpose or end; to make use of; to convert to one's own service; to avail oneself of; to employ; to put to a purpose, such as to use tools, to use a sword, to use flour to make bread, etc. It connotes utility, service, subservience to an end. It is a word of wide signification. (*British Motor Syndicate, Limited* v. *Taylor & Son* [1900], 1 Ch. 577, 583.) Application of the generally accepted meaning of the verb "use" is illustrated in the following cases: *State* v. *Davis*, 9 Hous. (Del.) 558; 33 Atl. 439, 440; *Park* v. *Candler*, 113 Ga. 647, 39 S. E. 89, 90; *State* v. *Stockwell*, 23 N. D. 70, 134 N. W. 767, 786; *Ball* v. *Houston*, 11 Okla. 233, 66 Pac. 358, 359; *United States* v. *The Anjer Head*, 46 Fed. 664; *State ex rel. Hayes* v. *Board of Equalization*, 16 S. D. 219, 92 N. W. 16. In its passive form the verb "use" is practically synonymous with "employ." (*United States* v. *The Anjer Head, supra.*) And it is in that sense that the word "used" is employed in the second sentence of section 9 of the Personal Property Tax Act.

Any valuation necessary or useful for the determination of tax liability under any other taxing statute, federal or territorial, and used by the taxpayer for that purpose would in the ordinarily accepted meaning of the word "used" come within the plain language of the second sentence of section 9 of the Personal Property Tax Act.

Nor is it material whether the valuation used for the determination of tax liability be a direct use or an indirect use. A valuation used indirectly for the determination of tax liability would nevertheless be "used" as that term is employed in the second sentence of section 9 of the Personal Property Tax Act.

For the fifteen years prior to the taxation date, the taxpayer has been in the receipt of an annual income requiring it to file returns for income tax purposes under both the existing federal and territorial laws. Under the local 1932 income tax law all taxpayers are required to keep full, complete, regular and accurate books of account in which all transactions are required to be entered in regular order. (R. L. 1935, § 2041.) The 1901 law contained a similar provision applicable to all persons or corporations doing business for profit. On January 1, 1934, the taxpayer, besides being a taxpayer under the Personal Property Tax Act, was also a "taxpayer" within the meaning of that term as employed in the federal and territorial income tax Acts. As a taxpayer under the federal and territorial income tax laws it was amenable to all the respective provisions thereof.

A uniformly accepted method of computing gross income of retail stores is to deduct from gross sales of merchandise the cost of merchandise sold. The cost of merchandise sold is computed by deducting from the aggregate of net inventory of merchandise at beginning of period and of cost of current purchases of merchandise, the net inventory of merchandise at end of period. This was the method

pursued by the taxpayer. The taxpayer in its brief described the method it employed in arriving at gross profits from the sale of merchandise as follows: "In the case of goods, wares and merchandise the taxpayer arrives at the gross profit by a simple and clearly understandable arithmetical computation. To the cost price of the merchandise on hand at the beginning of the previous year, which is ascertained through the method of an inventory, is added the cost price of merchandise purchased during the year, and from this sum is deducted the cost price of the inventory at the end of the year. The resulting figure is the cost price of the goods sold during the year; and the excess of the gross sales over the cost of goods sold is the gross profit for the year, from which, of course, should be deducted other expenses of doing business such as clerical hire, etc." This method is recognized and approved in the administration of both the federal and territorial income tax laws. To arrive at net income from sales of goods, wares and merchandise there must also be deducted from gross sales the various expenses of operation, maintenance and administration.

It is the accepted practice of traders to value inventories at the close of the accounting period. Different methods are employed. The more accepted practice is to value inventories according to cost or market whichever is lower. (See Saliers, *supra,* p. 369.) The method employed by the taxpayer was "cost." But whatever method employed the ultimate consideration sought is valuation. Because without valuation of inventories the computation of gross income from sales of merchandise and the computation of the resultant net income are impossible. Inventories at cost or cost or market whichever is lower, whichever method be employed, are essential to a proper disclosure of financial position. (*U. S. Cartridge Co.* v. *U. S.,* 284 U. S. 511.) Under the federal income tax law regulations of the

commissioner requiring the valuation of inventories at cost or market whichever is lower, have been uniformly sustained as the best method calculated to ascertain correct income. (*Lucas* v. *Structural Steel Co.*, 281 U. S. 264, 268; *United States* v. *Kemp*, 12 F. [2d] 7, 9; *Kemp* v. *United States*, *supra;* *Guy* v. *Commissioner of Internal Revenue*, 35 F. [2d] 139; *American Can Co.* v. *Bowers*, 35 F. [2d] 832; *Hunt* v. *United States*, 59 F. [2d] 1014; *Hutchins Lumber & Storage Co.* v. *Commissioner of Internal Revenue*, 53 F. [2d] 1016; *U. S. Cartridge Co.* v. *U. S.*, *supra.*) The purposes of inventories are to assign to each accounting period its profits and losses. (*U. S. Cartridge Co.* v. *U. S.*, *supra; Lucas* v. *Structural Steel Co.*, *supra; Industrial Lumber Co.* v. *Commissioner of Internal Revenue*, 58 F. [2d] 123.)

Fluctuations may affect inventory gains and losses. Radical differences in opening and closing inventory values may seriously influence gross income. Legitimate business practices admit the adoption of different methods of valuation to meet different conditions. Obviously a method of valuation suitable under certain conditions might be unsuitable under others. Peloubet says: "Probably the most important single factor in the determination of income for most enterprises is the correct valuation of the inventory." N. A. C. A. Bull. XVIII, No. 13, p. 746. The reasons for this observation are obvious.

The taxpayer in its profit and loss account as of December 31, 1933, included among receipts a net profit which it had realized for the year from the operation of the Paia Store and branches, the meat market and other selling agencies. A profit and loss account is a "history of operating results" of a trading, manufacturing or merchandising enterprise "over a period based on data covering gross income, cost of * * * commodities sold, and resultant effect on proprietorship." Saliers, *supra*, pp. 321, 407.

The taxpayer filed an income tax return with the local tax authorities on March 20, 1934. In it it included a return under the existing business excise tax law and a purported copy of its federal income tax return. Many of the items included in its business excise tax return are made a part of or applicable to or explanatory of the items included in its income tax returns. In its territorial income tax return as a part of its gross income it included gross sales other than sugar and molasses and claimed as a deduction from gross income the cost of goods sold. In our opinion under the evidence the taxpayer used inventories of merchandise in the determination of its federal and territorial income tax liability. Whether or not the values placed by the taxpayer upon its inventories on December 31, 1933, were their respective "fair and reasonable values" as the term is used in the Personal Property Tax Act we deem unnecessary to decide. The taxpayer assumes that the term "fair and reasonable value" as used in the Personal Property Tax Act is synonymous with "full cash value" and contends that the values placed upon its respective inventories were not fair and reasonable but were in excess thereof, admitting of a deduction for deterioration not reflected by the values placed thereon at the close of the accounting period. Whether it is correct in its assumption we do not pretend to say. But the plain language of the statute requires that the assessor adopt these values if they have been used by the taxpayer in the determination of its income tax liability. Holding as we have that in this proceeding the validity of the second sentence of section 9 of the Personal Property Tax Act may not be brought in question the plain terms of the section control. It might be said, however, in passing, that if as claimed by the taxpayer values of inventories were in excess of their fair and reasonable value the means were available for correcting the situation at the time it made up its income tax return. Assuming that the respective

specific objections to the assessments of merchandise in the Paia Store and its branches and in the meat market affect the assessment of "goods, wares and merchandise" as a whole, said objections cannot therefore be considered. The valuation of merchandise returned by the taxpayer having been used by it in the determination of its income liability under the federal and territorial income tax laws, it was mandatory upon the assessor to use that value as the fair and reasonable value thereof.

The record is silent however as to what the taxpayer did in the case of its supplies. No doubt the same method was employed but there is no evidence on the subject. Under the circumstances the quick lime and hydrated lime of the taxpayer included in the assessment of raw materials and supplies should have been assessed at its fair and reasonable value which appears to have been its book value less 15%. The quick lime was assessed by the assessor at $680; the hydrated lime at $613.60. The quick lime should therefore be assessed at the sum of $578; the hydrated lime at $521.56, making an over-assessment of $194.04.

In computing the gain or loss of a manufacturing or mercantile enterprise the exhaustion, wear and tear of property used in the business, including a reasonable allowance for obsolescence, are considered as an expense of operation. Although obsolescence is not synonymous with depreciation we shall hereafter as a matter of convenience refer to both depreciation and obsolescence by the term "depreciation." Both the federal and territorial income tax laws permit as a deduction from gross income a reasonable allowance for exhaustion, wear and tear of property used in trade or business or producing income which is included in gross income, including a reasonable allowance for obsolescence. (Revenue Act of 1932, § 23 [k] ; R. L. 1935, § 2034 [c].) Depreciation has been defined as follows: "The proper allowance for depreciation, including obsolescence

of property used in business, is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate) whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the property in the business, equal the cost or other basis of the property. In no instance may the total amount allowed be in excess of the amount represented by the difference between the cost or other allowable basis and the salvage value which reasonably may be expected to remain at the end of the useful life of the property in the trade or business. When the cost or other basis has been recovered by depreciation allowances no further allowance will be made." 2 Paul and Mertens, *Law of Federal Income Taxation* (1934), § 20.29, p. 569. The language of the federal and territorial laws defining depreciation is the same. Hence the definition quoted applies to both.

Depreciation has a dual purpose. It not alone serves to determine the amount of a legitimate item of operating expense but also to determine the value of the property subject to depreciation at the close of the period for which depreciation is taken. (Canning, *supra,* pp. 231, 258, 260, 272.) The taxpayer depreciated its machinery and equipment annually. The method of depreciation employed by it was what is known as the straight-line method although adjustments were made in 1933 for excessive depreciation. Accepted accountancy practice requires that in the case of capital assets upon taking depreciation the value of the property depreciated be thenceforth carried on the books of the business at its residual value. This was done by the taxpayer. The residual value of the permanent improvements of the taxpayer as of December 31, 1933, including the residual value of machinery and equipment was included in the assets of the taxpayer in its balance sheet for the year ending December 31, 1933. The residual value

of machinery and equipment as of December 31, 1933, was the valuation placed thereon by the taxpayer. The taxpayer also in its profit and loss statement of the 1933 crop for the year ending December 31, 1933, included in expenditures the depreciation written off by it at the close of the year upon its machinery and equipment. In the federal income tax return of the taxpayer it claimed as a deduction against gross income the total deduction taken by it for the year 1933 on all its permanent improvements, including machinery and equipment. In the territorial income tax return of the taxpayer it did likewise. But whereas the amount of depreciation deducted appears directly in the federal income tax return it is included in the territorial income tax return in the claimed deduction of "other expenses." The depreciation item in the taxpayer's statement of "reserve for depreciation account" and in its statement of "distribution of operating expenses for the twelve months ending December 31, 1933," though less than the deduction claimed for "other expenses" is readily traceable thereto as an included expense.

The taxpayer protests that assuming all this to be true, no valuation of its machinery and equipment was used by it for the determination of its income tax liability, the depreciation taken for the year 1933 pursuant to the straight-line method employed by it having been computed upon original cost. In a sense this is true but not entirely so. It is the actual value of the remaining useful life of depreciable property at the end of the period for which depreciation is taken measured in dollars and cents that is the determining factor. No greater depreciation may be taken than the actual value of the remaining useful life of the depreciated property plus depreciation theretofore taken admits. If the residual value plus the depreciation theretofore taken equals cost no further depreciation may be taken. The straight-line method of computing deprecia-

tion is a mere rule-of-thumb, employed as a substitute for the facts to which when inconsistent therewith it must unqualifiedly yield. Similar views have been expressed by other courts. "The 'straight-line method' assumes a uniform annual rate of depreciation over the life of the asset. It is simple, workable and ordinarily results in a 'reasonable allowance.' It is, however, a 'rule of thumb' to be supplemented when a method more applicable to any particular case is suggested and supported." 2 Paul and Mertens, *supra,* § 20.34, p. 581. "The defendants' expert apparently prefers what he terms 'the straight line method.' As the court understands it, in this method the main factors are the age of the plant and its probable life. The age is ascertained from the history and inspection, and the probable life from studies and inspection by experienced men. It is assumed that the depreciation is uniform and constant, and defendants' expert stated that it was used in those plants where the depreciation is uniform and constant. Having ascertained the age of the property and its probable life, a definite rule is obtained whereby to fix exactly the amount of depreciation at any particular time. Thus, as explained by the witness, if the property is five years old and its probable life is ten years, the depreciation is 50 per cent. It is obvious that this rule is highly theoretical and may in many cases lead to grossly erroneous results." *Southern Bell Tel. & Tel. Co.* v. *Railroad Com'n of S. C.,* 5 F. (2d) 77, 95.

"Depreciation is a matter of judgment and must be determined from evidence rather than by formulae, mathematics, or theories." 2 Paul and Mertens, *supra,* § 20.34, p. 582. Depreciation is a question of fact. It is the value of the remaining useful life of the property depreciated determined by its actual physical condition that controls. (*Re Taxes Onomea Sugar Co., supra.*) Original cost has nothing to do with depreciation further than it limits the

aggregate amount that may be ultimately depreciated.

The taxpayer has misconceived the concepts of depreciation. Neither the straight-line method nor any similar method of depreciation is anything more than a conventional substitute for the facts. Precedent and authority sustain this. "Depreciation is a question of fact, not of book entries. Proof as to what the books show is usually nothing more than proof that depreciation was taken in the amount shown and such evidence must be supplemented by proof of the adequacy of such amounts in their relation to the depreciation sustained. Since depreciation is a question of fact, what may be the life of a given class of assets under general conditions is not conclusive. The evidence must be specific as to the particular assets." 2 Paul and Mertens, *supra,* § 20.106, pp. 653, 654. "Depreciation or obsolescence is always a question of fact. 'Straight line depreciation,' so called, which the Commissioner used in this case, is an artificial and conventional method of getting at the loss of value in a manufacturing plant during a prescribed period. It undoubtedly has its place, but it must yield to the facts in any particular case." *Washburn Wire Co.* v. *Commissioner of Internal Revenue,* 67 F. (2d) 658, 660. "Of course, there is no method of determining depreciation with exact mathematical precision. In physical examination the depreciation rests upon estimates and opinions of witnesses. But the theoretical methods mentioned rest not only upon estimate and opinion, but upon the correctness of a theory which is of doubtful correctness in many cases, and which we know cannot be correct in all cases. My own view is that certainly in a case of this kind the actual personal physical examination of the property by competent witnesses and their estimate and opinion of the actual depreciation is a better guide than any of the theoretical methods that have been suggested." *Southern Bell Tel. & Tel. Co.* v. *Railroad Com'n of S. C., supra,* p. 95. "It

may also not be amiss to say further that in my judgment the element of depreciation should not be measured by a theoretical yardstick, but should be determined by a careful consideration of the actual facts touching the physical condition of each particular plant under consideration." *Landon* v. *Court of Industrial Relations,* 269 Fed. 433, 445. "While the straight-line or fixed percentage method used by the commissioner in determining plaintiff's allowable depreciation for the years from June 30, 1910, to and including the fiscal year ending June 30, 1917, is the one most generally used in determining depreciation for tax purposes, and is quite generally accepted as the simplest and most accurate of the various methods used, computation made on that basis can not stand where the facts in a particular case, as here, show that the result reached by the use of such methods would not be a reasonable allowance within the meaning of the statute. The facts in the case bring it within the rule announced in the decisions cited that depreciation in each case must be determined by the particular facts of such case, and that a computation based on a fixed percentage deduction during estimated probable useful life will not be accepted as the reasonable allowance provided by the statute where the facts show the actual depreciation sustained and charged upon the books was reasonable, and was an amount different from that found by the use of such method of computation. We think the method used by the plaintiff for determining depreciation during the year in controversy established more accurately than the straight-line method used by the commissioner the reasonable allowance for wear and tear it was entitled to charge off its books each year." *Cumberland Glass Mfg. Co.* v. *United States,* 44 F. (2d) 455, 462. "No rule or rate can in all instances accurately measure depreciation. While it may form a safe basis for a prima facie case, it must give way to the facts in each particular case

if those facts are presented and are inconsistent with the rate." *Geuder, Paeschke & Frey Co.* v. *Com'r of Internal Revenue,* 41 F. (2d) 308, 310. "Facts shown by reliable evidence were preferable to averages based upon assumed probabilities. When a plant has been conducted with unusual skill the owner may justly claim the consequent benefits. The problem was to ascertain the probable result of the specified rate if applied under well known past conditions, not to forecast the probable outcome of a proposed rate under unknown future conditions." *Pacific Gas Co.* v. *San Francisco,* 265 U. S. 403, 406.

The concepts of depreciation are best understood by an appreciation of its functions. It is not alone an item of operating expenses and by the grace of the taxing power allowed as a deduction from gross income, but it is the means by which the integrity of invested capital is preserved. In 2 Paul and Mertens, *supra,* § 20.20, p. 561, it is said: "Basic to the whole subject of depreciation is the determination of the capital sum recoverable through the allowance. This is the amount which over the years will be exempted from tax. In the immediate sense the allowance for the particular year is the question, but that amount cannot be computed without fixing first the capital sum recoverable through all the years of useful life. In the ultimate sense the capital sum is highly important because it is the amount of such capital sum which measures the extent of the freedom from tax." Again the same authors say that the basic principle of the allowance of depreciation as a deduction against gross income is to permit the taxpayer to create and provide "a nontaxable fund to restore property used in producing income at the end of its useful life, when its capacity to produce income has ceased." Id. § 20.01, p. 544. The purpose of the allowance of depreciation is explained in the United States Supreme Court in *Knoxville* v. *Water Co.,* 212 U. S. 1, 13. There the court

said: "It [the company] is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning." From the language employed it is obvious that while original cost may be used as a basis of computation of depreciation by the straight-line method, it is in reality the measure of depreciation that may be taken beyond which it may not exceed.

The relation that original cost bears to depreciation and what residual value really is is best appreciated by the steps that led to the modification of article 205 of Regulations 77 of the United States Bureau of Internal Revenue. Regulations 77 pertained to the Revenue Act of 1932. Article 205 had to do with depreciation and what should be done in the event that it developed that the useful life of the property should be longer than the useful life as originally estimated under the then known facts.

The partial disallowance of depreciation was under consideration by the ways and means committee of the house of representatives of the seventy-third Congress. The secretary of the treasury addressed the committee protesting their action. Among other things he said: "Study has shown that through past depreciation deductions many taxpayers have * * * built up reserves for depreciation which are out of proportion to the prior exhaustion, wear, and tear of the depreciable assets. * * * In order to overcome this condition the Bureau proposes to reduce substantially the deductions for depreciation with respect to many taxpayers in various industries, so that for the remaining life of the assets depreciation will be in effect reduced to the extent that it may have been excessive in prior years. It is intended that this end shall be accomplished * * * by specifically requiring that all deductions for depreciation shall be limited to such amounts as may

reasonably be considered necessary to recover during the remaining useful life of any depreciable asset the *unrecovered basis of the asset.*" (Italics provided.) 2 Paul and Mertens, *supra,* § 20.02, p. 548. The committee, upon the recommendation of the secretary of the treasury, took no further steps in the matter. In February, 1934, the treasury department substantially modified the then existing regulations providing for the method of computing the depreciation allowance. As so modified, the regulations provide as follows: "The capital sum to be recovered shall be charged off over the useful life of the property, either in equal annual installments or in accordance with any other recognized trade practice, such as an apportionment of the capital sum over units of production. Whatever plan or method of apportionment is adopted must be reasonable and must have due regard to operating conditions during the taxable period. The reasonableness of any claim for depreciation *shall be determined upon the conditions known to exist at the end of the period for which the return is made.* Where the cost or other basis of the property has been recovered through depreciation or other allowances no further deduction for depreciation shall be allowed. The deduction for depreciation in respect of any depreciable property for any taxable year *shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis.* The burden of proof will rest upon the taxpayer to sustain the deduction claimed. Therefore, taxpayers must furnish full and complete information with respect to the cost or other basis of the assets in respect of which depreciation is claimed, their age, condition and remaining useful life, the portion of their cost or other basis which has been recovered through depreciation allowances for prior taxable years, and such other information as the commissioner may re-

quire in substantiation of the deduction claimed." (Italics provided.) Reg. 77, 74, Art. 205 (Rev. Act of 1932), as amended by TD 4422, CB XIII-1. This article was made retroactive to include all revenue Acts since 1921. Treasury Decision 4422 (I. R. B. XIII-16-6754, Mim. 4170), approved February 28, 1934, contains the following significant language: "If, upon examination and verification of the schedule, it is found that the cost or other basis of any depreciable property has been fully recovered though the property is still in use or where the reserve as provided is higher than is justified by *the actual physical condition of the property, it will be presumed that the depreciation rates allowed in the past have been excessive.*" (Italics provided.)

Thus it will be seen that in computing depreciation the controlling element, the remaining useful life of the property, is factual; the value of the remaining useful life of the property depreciated is factual; and that upon that value as a fact depends the amount of depreciation. Original cost of the property is not involved further than original cost and all other facts and circumstances material to the question of value may be considered. Original cost is only considered in respect to the relation that it bears to depreciation previously taken upon the property. Original cost determines and limits the aggregate depreciation allowable. And hence it is that the depreciation that may be taken for a given period may not exceed an amount which, with the actual value of the remaining useful life of the property depreciated, plus depreciation theretofore taken, equals original cost. Employment of the straight-line method of computing depreciation or any similar method is merely a conventional substitute and must be construed in the light of the purpose it is calculated to effect. That it is a substitute does not detract from its usefulness and convenience in computing depreciation.

Its use is approved by the taxing authorities. But it is but a conventional formula. And as such its terms must not be confused with the legal concepts of depreciation for which it is but a substitute. At the end of each accounting period when depreciation is taken it is the then actual value of the then remaining useful life of the item subject to depreciation and not the predetermined rate of depreciation computed upon cost that controls.

The valuations placed by the taxpayer upon its machinery and equipment as of December 31, 1933, while not used directly for the determination of its income tax liability, were indirectly used for that purpose. The valuations of machinery and equipment as thus determined, though used indirectly, nevertheless, in our opinion, were used by the taxpayer in the determination of its income tax liability under the federal and territorial income tax laws, in the sense of the language employed in the second sentence of section 9 of the Personal Property Tax Act.

The taxpayer protests that its income tax returns were filed on March 20, 1934, after the taxation date fixed by the Personal Property Tax Act and hence it cannot be said to have used any valuation to determine its income tax liability prior to that date. The evidence indicates an antecedent design and purpose on the part of those conducting the business of the taxpayer to use the valuations of its merchandise and of its machinery and equipment determined by it as of December 31, 1933, for the determination of its tax liability upon its net income for the year 1933.

The design and purpose to use the valuations of its merchandise and of its machinery and equipment not alone existed prior to December 31, 1933, but continued from that date to at least March 20, when the taxpayer filed its income tax return. The valuations so used on December 31, 1933, were continuously used upon that date and there-

after, including the taxation date under the Personal Property Tax Act. The valuations as thus determined and used on December 31, 1933, continued to exist and to be used upon the day following which was the taxation date under the Personal Property Tax Act and hence were "used" within the meaning of the word "used" as employed in section 9 of the Act.

Nor in our opinion is it material that under the federal and territorial income tax laws the taxes on net income of the year 1933 were assessed upon a date subsequent to the taxation date under the Personal Property Tax Act. If, as we hold, valuations were used upon the taxation date fixed by the Personal Property Tax Act for the determination of income tax liability later to accrue, it is immaterial that the purpose of the use was realized after such date. A parallel case is that of *Moses* v. *Raywood*, 2 K. B. (1911) 271. It is the use and not the realization of the purpose of the use that controls.

The deduction claimed against "mill improvements" does not affect the assessment of "machinery and equipment" as a whole and consistently with our earlier opinion it will not be considered. In fact, it does not even appear to what specific items of machinery included in "mill improvements" the deduction claimed applies.

While it appears that for accounting purposes the taxpayer placed a valuation upon growing crops, it does not appear however that it used such valuation for the determination of its income tax liability. None of the costs of the 1934, 1935 or 1936 crops were charged against the gross income of 1933. On the contrary it affirmatively appears that the costs of each crop were carried forward and charged against the gross proceeds of sales of sugar manufactured from the crop to which the crop costs relate. It was the costs of the 1933 crop that were deducted from the gross income of 1933. The assessor therefore was in

error in using as the fair and reasonable value of the growing crops of the taxpayer the costs of growing crops. It consequently becomes unnecessary for us to pass upon the deductions claimed by it against the costs of growing crops.

On the other hand this court is without jurisdiction to consider any objection to the assessment of growing crops upon the ground of overvaluation. Holding as we do that growing crops were not assessed separately for each item thereof, but on the contrary were assessed *en masse,* consistently with our views heretofore expressed, the appeal of the taxpayer from the *en masse* assessment did not present to the intermediate appellate bodies, nor does it present to this court for review, any question of overvaluation of any unit item of growing crops included in the *en masse* assessment but on the contrary such appeal is confined solely to the consideration of overvaluation in respect to growing crops as a whole. None of the specific objections alleged to the assessment of growing crops affect the assessment of growing crops as a whole with the possible exception of the first objection and it refers solely to costs of growing crops and not to fair and reasonable value thereof. Consequently the specific objections to the assessment of "growing crops" will not be considered.

To conform to our decision herein the assessment list of the assessor of the second taxation division should be amended by the assessor reducing his assessment of the personal property of the taxpayer as of January 1, 1934, by the amount of $194.04.

*J. V. Hodgson,* Assistant Attorney General (*W. B. Pittman,* Attorney General, and *S. B. Kemp,* Attorney General, with him on the briefs), for the tax assessor.

*R. A. Vitousek, A. G. Smith* and *M. Cades* (*W. L. Stanley, R. A. Vitousek, C. D. Pratt* and *Smith, Wild, Beebe & Cades* on the briefs) for the taxpayer.